UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------X

SANDRA KRUPP,

                    *Plaintiff*,                **MEMORANDUM AND ORDER**

     -against-                                  20-CV-4586(KAM)

COMMISSIONER OF THE SOCIAL SECURITY
ADMINISTRATION,

                    *Defendant*.

---------------------------------------X

**KIYO A. MATSUMOTO, United States District Judge:**

          Plaintiff Sandra Krupp appeals the final decision of the
Commissioner of the Social Security Administration ("Defendant" or
the "Commissioner"), finding Plaintiff not disabled within the
meaning of the Social Security Act (the "Act") and thus not
entitled to supplemental security income under Title XVI of the
Act.  Plaintiff and the Commissioner have cross moved for judgement
on the pleadings.  For the reasons herein, Plaintiff's motion is
respectfully **DENIED**, and the Commissioner's cross-motion is
**GRANTED**.

1

## **BACKGROUND**

The parties have filed a joint stipulation of relevant facts, which the Court has reviewed and incorporates by reference. (*See generally* ECF No. 19, Joint Stipulation of Facts.)  On August 15, 2017, Plaintiff filed an application for supplemental security income, alleging disability since May 6, 2016.  (Administrative Transcript ("Tr.") at 57—58, 180.)  Plaintiff claimed that she was disabled due to migraines, prediabetes, carpal tunnel syndrome, sciatica, severe allergies, dyslexia, knee problems, obesity, asthma, and vitamin deficiency.  (*Id.* at 57-58, 243.)  Plaintiff's application was denied initially on December 14, 2017.  (*Id.* at 71.)

On December 21, 2017, Plaintiff filed a request for a hearing before an administrative law judge.  (*Id.* at 75.) Administrative Law Judge Margaret Pecoraro (the "ALJ") held a hearing on September 17, 2019, and Plaintiff attended the hearing in person, represented by her attorney, Kira Treyvus, Esq.  (*Id.* at 33.)  Benson Kinyankui, a vocational expert, was also present at the hearing.  (*Id.*)  In a decision dated November 20, 2019, the ALJ determined that Plaintiff was not disabled.  (*Id.* at 22.) Plaintiff appealed the ALJ's decision to the Appeals Council on November 27, 2019.  (*Id.* at 5, 177—79.)  On August 12, 2020, the Appeals Council denied review of the ALJ's decision, rendering it

the final decision of the Commissioner.  (*Id.* at 1.)  The instant appeal followed.  (*See generally* ECF No. 1, Complaint.)

## LEGAL STANDARD

Unsuccessful claimants for supplemental security income may bring an action in federal court seeking judicial review of the Commissioner's denial of benefits.  42 U.S.C. §§ 1383(c)(3), 405(g).  The reviewing court does not have the authority to conduct a *de novo* review and may not substitute its own judgment for that of the ALJ, even when it might have justifiably reached a different result.  *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012).  Rather, "[a] district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal error."  *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008) (internal quotation marks and citation omitted).

"Substantial evidence is more than a mere scintilla," and must be relevant evidence that a "reasonable mind might accept as adequate to support a conclusion."  *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (citing *Richardson v. Perales*, 420 U.S. 389, 401 (1971) (internal quotation marks omitted)).  *See Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) ("The substantial evidence standard means once an ALJ finds facts, [the court] can reject those facts 'only if a reasonable factfinder

3

would *have to conclude otherwise*.'" (citations omitted)).  If there is substantial evidence in the record to support the Commissioner's factual findings, those findings must be upheld.   42 U.S.C. § 405(g).  Inquiry into legal error requires the court to ask whether "the claimant has had a full hearing under the [Commissioner's] regulations and in accordance with the beneficent purposes of the Social Security Act." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (quoting *Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir. 1990) (internal quotation marks omitted)).

> To receive supplemental security income, a claimant must be "disabled" within the meaning of the Act.   *See* 42 U.S.C. § 1382c(a)(3)(A).[1]  A claimant qualifies as disabled when she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* § 1382c(a)(3)(A); *Shaw v. Chater*, 221 F.3d 126, 131–32 (2d Cir. 2000).  The impairment must be of "such severity" that the claimant is unable to do his previous work or engage in any

---

[1] The statutory definitions of disability are identical under both Title II Disability Insurance and Title XVI Supplemental Security Income Programs. *Compare* 42 U.S.C. § 423(d) *with* 42 U.S.C. § 1382c(a)(3).  Moreover, "[c]ases under 42 U.S.C. § 423 are cited interchangeably with cases under 42 U.S.C. § 1382c(a)(3)." *Lopez v. Comm'r of Soc. Sec.*, No. 18-cv-7564(JGK), 2020 WL 364172, at *1 n.1 (S.D.N.Y. Jan. 22, 2020).

other kind of substantial gainful work. 42 U.S.C. §
1382c(a)(3)(B).

The regulations promulgated by the Commissioner set
forth a five-step sequential evaluation process for determining
whether a claimant meets the Act's definition of "disabled." *See*
20 C.F.R. § 416.920. The Commissioner's process is essentially as
follows:

> [I]f the Commissioner determines (1) that the claimant
> is not working, (2) that he has a "severe impairment,"
> (3) that the impairment is not one [listed in Appendix
> 1 of the regulations] that conclusively requires a
> determination of disability, and (4) that the claimant
> is not capable of continuing in his prior type of work,
> the Commissioner must find him disabled if (5) there is
> not another type of work the claimant can do.

*Burgess*, 537 F.3d at 120 (2d Cir. 2008) (quoting *Green-Younger v.
Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003)); *accord* 20 C.F.R. §
416.920(a)(4). During this five-step process, the Commissioner
must consider whether the combined effect of all of a claimant's
impairments, including those that are not severe, would be of
sufficient severity to establish eligibility for Social Security
benefits. 20 C.F.R. § 416.923(c).

"The claimant has the general burden of proving . . .
his or her case at steps one through four of the sequential five-
step framework established in the SSA regulations." *Burgess*, 537
F.3d at 128 (internal quotation marks and citations omitted).
"However, because a hearing on disability benefits is a

5

nonadversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record." *Id.* (internal quotation marks and citations omitted). "The burden falls upon the Commissioner at the fifth step of the disability evaluation process to prove that the claimant, if unable to perform her past relevant work, is able to engage in gainful employment within the national economy[, given her residual functional capacity, age, education, and work experience]." *Sobolewski v. Apfel*, 985 F. Supp. 300, 310 (E.D.N.Y. 1997).

"The Commissioner must consider the following in determining a claimant's entitlement to benefits: '(1) the objective medical facts and clinical findings; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability . . . ; and (4) the claimant's educational background, age, and work experience.'" *Balodis v. Leavitt*, 704 F. Supp. 2d 255, 262 (E.D.N.Y. 2001) (quoting *Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999)).

## THE ALJ'S DISABILITY DETERMINATION

The ALJ analyzed Plaintiff's application using the five-step sequential process, as required by the Act's implementing regulations. At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since August 15, 2017, the date of her application for supplemental security income. (Tr. at 11.)

At step two, the ALJ determined that Plaintiff suffered from bronchial asthma, diabetes mellitus, degenerative disc disease of the lumbar spine, hypertension, obesity, and carpal tunnel syndrome, which "significantly limited" her ability to perform basic work activities. (*Id.*) The ALJ found Plaintiff's Bell's palsy and depressive disorder to be non-severe, and noted that she considered Plaintiff's severe and non-severe impairments in reaching her disability determination. (*Id.* at 11-12.)

At step three, the ALJ determined that Plaintiff's impairments, considered singly or in combination, did not meet or medically equal the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.920(d), 416.925, and 416.926), specifically, Sections 1.00 (Musculoskeletal System), 3.00 (Respiratory System), 4.00 (Cardiovascular System), 9.00 (Endocrine System), and 12.00 (Mental Impairments).[2] (Tr. at 13.)

At step four, the ALJ determined that Plaintiff was unable to perform her past relevant work as childcare worker or medical assistant. (*Id.* at 20) The ALJ found that Plaintiff had the residual function capacity ("RFC") to perform light work as defined in 20 C.F.R. § 416.967(b), with the following limitations: (1) occasionally climbing stairs/ramps, stooping, bending,

---

[2] The Court notes that Plaintiff's attorney did not argue during the September 17, 2019 hearing before the ALJ that Plaintiff's physical impairments met or equaled the severity of any listed impairment. (*See* Tr. at 35–36.)

crouching, and crawling; (2) never climbing ladders, ropes, or scaffolds; (3) never kneeling; (4) avoiding dust, fumes, gases, odors, chemicals, poor ventilation, unprotected heights, dangerous machinery, and dangerous moving mechanical parts; and (5) performing simple, routine tasks. (*Id.* at 13.)

At step five, the ALJ concluded that there were jobs that exist in significant numbers in the national economy that Plaintiff could perform, based on her age, education, work experience, and RFC. (*Id.* at 20.) The vocational expert testified that Plaintiff could perform the requirements of representative occupations such as a ticket taker and a small products assembler. (*Id.* at 21.) Accordingly, the ALJ found that Plaintiff was not "disabled" and thus not entitled to supplemental security income under the Act. (*Id.* at 22.)

## DISCUSSION

### I.  The ALJ's Assessment of Medical Opinion Evidence

The SSA adopted new regulations effective March 27, 2017, revising the standard for evaluating medical opinion evidence and effectively abolishing the treating physician rule. *See* 20 C.F.R. § 416.920c. Because Plaintiff filed her claim on August 15, 2017, the new regulations apply.

Under the new regulations, the Commissioner no longer "defer[s]" or gives "controlling weight" to a claimant's treating medical sources. *Id.* § 416.920c(a). Instead, when evaluating the

8

persuasiveness of medical opinions, the Commissioner considers the following five factors: (1) supportability; (2) consistency; (3) the relationship of the medical source with the claimant (taking into account the length of the treatment relationship, the frequency of examinations, the purpose of the treatment relationship, the extent of the treatment relationship, and whether the relationship is an examining relationship); (4) the medical source's specialization; and (5) other factors, including, but not limited to, "evidence showing [the] medical source has familiarity with the other evidence in the claim or an understanding of [the SSA] disability program's policies and evidentiary requirements." *Id.* § 416.920c(c).   The ALJ must explain how she considered the supportability and consistency factors in evaluating the persuasiveness of a medical opinion, but not the other factors. *Id.* § 416.920c(b)(2).

Plaintiff argues that the ALJ improperly weighed the opinions of Drs. Audrey Weissman, Plaintiff's treating physician, and Iqbal Teli, a consultative examiner.   Specifically, Plaintiff asserts that the ALJ erred by discounting Dr. Weissman's opinion solely based on its inconsistencies with what Plaintiff alleges to be "outdated information . . . derived from a [c]onsultative [e]xamination by Dr. Teli." (ECF No. 17-2, Plaintiff's Memorandum of Law in Support of Plaintiff's Motion for Judgment on the Pleadings ("Pl.'s Mem."), at 10.) Plaintiff argues that Dr. Teli's

9

medical opinion and findings, which were based on a consultative examination that took place on October 23, 2017, almost two years prior to the administrative hearing before the ALJ, is outdated, especially given that "Plaintiff's need to use a cane occurred after Dr. Teli's [c]onsultative [e]xamination." (*Id.* at 11.)

### A. Dr. Weissman's Medical Opinion

Dr. Weissman began treating Plaintiff in 2015, seeing Plaintiff every three to four months. (Tr. at 15, 334.) During Plaintiff's October 19, 2018 visit, Dr. Weissman diagnosed Plaintiff with bronchial asthma, a herniated disc in the lumbar spine, allergic rhinitis, sciatica, and vitamin D deficiency. (*Id.* at 386.) Dr. Weissman noted "much improvement with" Plaintiff's right-sided Bell's palsy, apart from "a little eye drooping," as well as Plaintiff's complaint of her worsening right-sided sciatica. (*Id.*) Plaintiff also reported that the carpal tunnel syndrome in her left hand was painful and causing her hand to fall asleep and become numb. (*Id.*)

Dr. Weissman's medical source statement, dated August 12, 2019, stated that Plaintiff suffered from Type II diabetes mellitus, chronic sinusitis, allergic rhinitis, extrinsic bronchial asthma/COPD, sciatica, lumbar spinal stenosis, migraines, headaches, right-sided Bell's palsy, cervical radiculopathy, and numbness of the hands. (*Id.* at 334.) With regard to Plaintiff's work-related functional limitations, Dr.

Weissman indicated that Plaintiff could walk less than one city block without having to rest or experiencing pain. (*Id.* at 335.) Dr. Weissman opined that Plaintiff could only sit for about two hours in an eight-hour workday, for no more than 5 to 10 minutes at a time, and could only stand for about two hours total, for no longer than 10 to 15 minutes at a time. (*Id.* at 335.) Dr. Weissman also opined that Plaintiff would need to shift positions at will from sitting, standing, or walking, and would need to walk around every 5 minutes. (*Id.*) According to Dr. Weissman, Plaintiff could never twist, stoop, crouch, or climb stairs or ladder, and must use a cane or other hand-held assistive device to stand/walk due to her imbalance, pain, weakness, and dizziness. (*Id.* at 336.)

Additionally, Dr. Weissman assessed that Plaintiff could rarely—1 to 5 percent of an eight-hour workday—lift and carry less than 10 pounds, could never use her hands to grasp, turn, or twist objects, and could only use her fingers for fine manipulations for 10 percent of an eight-hour workday. (*Id.* at 336—37.) Finally, Dr. Weissman opined that Plaintiff's symptoms were of such severity that she would be "off task," or not be able to sustain attention and concentration for even simple work tasks, for 25 percent or more of a typical workday, Plaintiff's conditions would produce "good days" and "bad days," and that Plaintiff would likely be absent from work more than four times a month due to her impairments or treatment. (*Id.* at 337.)

11

### B.   Dr. Teli's Medical Opinion

Dr. Teli conducted a consultative examination of
Plaintiff on October 23, 2017. (*Id.* at 324.) In his examination
report, Dr. Teli noted that Plaintiff's chief complaints related
to her "continuous, stabbing-like" lower back pain, of 10/10
intensity, that "radiat[ed] to [her] right lower extremity with
numbness," "sharp" left knee pain, also of 10/10 intensity, and
asthma. (*Id.*) Dr. Teli also noted Plaintiff's history of
hypertension, diabetes, and Bell's palsy.

Dr. Teli noted, upon examination, that Plaintiff was
extremely obese, "appear[ed] to be in no acute distress," had a
normal gait and stance, did not attempt to walk on heels or toes,
or squat, used no assistive devices, required no help changing, or
getting on or off the examining table, and was able to rise from
a chair without difficulty. (*Id.* at 325.) Dr. Teli assessed that
Plaintiff's facies were normal but observed "right facial
weakness." (*Id.*)

In addition, Dr. Teli made the following musculoskeletal
findings, among others: (1) for the lumbar spine, 85 degrees of
flexion, 15 degrees of extension, 10 degrees of lateral flexion on
both sides, 20 degrees of lateral rotation on the right, and 25
degrees of lateral rotation on the left; (2) negative bilateral
straight leg raise test; (3) full range of motion in the shoulders,
wrists, elbows, forearms, hips, and ankles; and (4) 130 degrees of

12

knee flexion on both sides.  (*Id.*)  Dr. Teli noted tenderness in the left knee, intact hand and finger dexterity, 5/5 grip strength in both hands, and 5/5 strength in the upper and lower extremities. (*Id.* at 325–26.)  Dr. Teli also noted decreased pain sensation in Plaintiff's right hand and the lack of pain sensation in both legs. (*Id.* at 325.)

Dr. Teli diagnosed Plaintiff with a history of lower back pain, Bell's palsy, hypertension, diabetes, bronchial asthma, and left knee pain.  (*Id.* at 326.)  Dr. Teli opined that Plaintiff had a moderate restriction for squatting, and mild restrictions for bending, and prolonged standing and walking, and that Plaintiff should avoid dust and respiratory irritants.  (*Id.*)

The ALJ determined that Dr. Weissman's opinion was unpersuasive because it was "inconsistent and unsupported by the overall record," (*id.* at 19), and noted that Plaintiff was never hospitalized or visited an emergency room due to her asthma, her lungs were "clear" upon examinations, and pulmonary function studies have, at most, shown "mild findings." (*Id.*)  With respect to Plaintiff's musculoskeletal complaints, the ALJ noted that Plaintiff had normal strength in the upper and lower extremities, 5/5 grip strength, intact finger and hand dexterity, and normal range of motion in the wrists and upper extremities, and did not use an assistive device.  (*Id.*)  Further, the ALJ stated that Plaintiff "has had only conservative treatment."  (*Id.*)  The ALJ

13

found Dr. Teli's opinion "persuasive" and consistent with his own
clinical findings.  (*Id.*)

### C.   The ALJ Did Not Err by Relying on Dr. Teli's Medical Opinion and Findings

Plaintiff asserts that the ALJ improperly rejected Dr.
Weissman's opinion as to Plaintiff's functional capabilities based
solely on Dr. Teli's outdated clinical findings.  (Pl.'s Mem. at
10–11.)  "It is error for an ALJ not to account for the fact that
medical opinions are stale."  *Rodriguez v. Comm'r of Soc. Sec.*,
No. 20-cv-3687(VSB), 2021 WL 4200872, at *18 (S.D.N.Y. Aug. 19,
2021).  "[A] medical opinion may be stale if it does not account
for the claimant's deteriorating condition."  *Id.*  "A medical
opinion is not necessarily stale," however, "simply based on its
age.  A more dated opinion may constitute substantial evidence if
it is consistent with the record as a whole notwithstanding its
age."  *Biro v. Comm'r Of Soc. Sec.*, 335 F. Supp.3d 464, 470
(W.D.N.Y. 2018).  *See Jones v. Comm'r Of Soc. Sec.*, No. 10-cv-
5831(RJD), 2012 WL 3637450, at *1-*2 (E.D.N.Y. Aug. 22, 2012) (ALJ
should not have relied on medical opinion in part because it "was
1.5 years stale" as of plaintiff's hearing date and "did not
account for her deteriorating condition").

In the instant case, Dr. Teli conducted a consultative
examination of Plaintiff on October 23, 2017, almost two years
prior to Plaintiff's hearing before the ALJ.  Plaintiff argues

that Dr. Teli's examination findings and medical opinion are stale because Plaintiff's physical conditions deteriorated since the examination, requiring Plaintiff to use a cane to ambulate. (Pl.'s Mem. at 15–16.)   Based on its review of the medical record, the Court finds that the ALJ did not err by failing to account for Plaintiff's deteriorating condition in relying on Dr. Teli's medical opinion and findings.

Dr. Weissman's medical source statement, in which she indicated that Plaintiff must use a cane or other hand-held assistive device to stand or walk, due to her imbalance, pain, weakness, and dizziness, was completed on August 12, 2019, (Tr. at 336, 338), about a month before Plaintiff's administrative hearing. (*Id.* at 31.)   Notably, when asked by her attorney during the hearing whether she had any difficulty walking, Plaintiff testified that when she had to walk about two blocks, she would "walk, . . . stop a little bit, take a deep breath, and then . . . walk again because then [her] asthma [would] start[ ] acting up." (*Id.* at 40.)   Plaintiff, however, did not testify that she had to use a cane or other assistive device to stand or walk, and the ALJ stated several times in her decision that Plaintiff "does not use an assistive device." (*Id.* at 14–15; 18–19.)   Furthermore, other than the medical source statement, Dr. Weissman's treatment notes do not mention that Plaintiff required an assistive device, or that she was ever prescribed one.   Accordingly, the Court finds

15

that there was not evidence of a significant deterioration in Plaintiff's conditions that rendered Dr. Teli's opinion stale, and the ALJ did not err in relying on Dr. Teli's medical opinion and findings in assessing the persuasiveness of Dr. Weissman's opinion.

> **D.    The ALJ's Failure to Properly Evaluate the Medical Opinions of Drs. Weissman and Teli was Harmless Error**

In addition to arguing that the ALJ erred in relying on the "outdated" clinical findings of Dr. Teli, Plaintiff asserts that the ALJ did not properly evaluate the medical opinions using all the regulatory factors set forth in 20 C.F.R. § 404.1520c(c). (Pl.'s Mem. at 10—12 ("The ALJ's assessment . . . failed to fully evaluate the 6-factors . . . .").)  The Court finds that the ALJ failed to properly analyze the supportability and consistency factors as required by the applicable regulations.[3]  *See Ayala*, 2022 WL 3211463, at *16 ("The ALJ 'must,' on a source-level, 'explain his [ ] approach with respect to the [supportability and

---

[3] Plaintiff also contends that the ALJ did not evaluate or discuss the treating relationship between Plaintiff and Dr. Weissman.  (Pl.'s Mem. at 11—12).  Under the new regulations, the ALJ must explain how she evaluated the two "most important factors," supportability and consistency, but "[i]n most instances . . . is not required to[ ] discuss the other factors previously required to assess medical opinion evidence (i.e., relationship with the claimant, specialization, and other relevant factors)."  *Ayala v. Kijakazi*, No. 20-cv-09373(RWL), 2022 WL 3211463, at *4 (S.D.N.Y. Aug. 9, 2022) (citations omitted). "The ALJ must consider those additional factors if there are 'two or more medical opinions . . . about the same issue [that] are both equally well-supported . . . and consistent with the record . . . but are not exactly the same,' at which point the ALJ must 'articulate how [she] considered the other most persuasive factors . . . .'"  *Id.* (citation omitted).

16

consistency factors] when considering a medical opinion.'") (alternations in original) (quoting *Vellone v. Saul*, No. 20-cv-261(RA), 2021 WL 319354, at *6 (S.D.N.Y. Jan. 29, 2021), *R. & R. adopted*, 2021 WL 2801138 (S.D.N.Y. July 6, 2021)); *Prieto v. Comm'r of Soc. Sec.*, No. 20-cv-3941(RWL), 2021 WL 3475625, at *13 (Aug. 6, 2021) ("Eschewing rote analysis and conclusory explanations, the ALJ must discuss the crucial factors in any determination . . . with sufficient specificity to enable the reviewing court to decide whether the determination is supported by substantial evidence.") (quoting *Vellone*, 2021 WL 319354, at *4 (internal quotation marks omitted)).

In finding Dr. Weissman's opinion "unpersuasive," the ALJ cited to the inconsistencies between Dr. Weissman's opinion and Dr. Teli's clinical findings, results of pulmonary function studies, and Plaintiff's "conservative treatment," (Tr. at 19), but did not explain her consideration of the supportability factor. "[S]upportability, under the new regulations, has to do with the fit between the medical opinion offered by the source and the underlying evidence and explanations presented by that source to support her opinion." *Navedo v. Kijakazi*, No. 20-cv-10013(JLC), 2022 WL 2912986, at *9 (S.D.N.Y. July 25, 2022). In other words, the ALJ failed to explain whether Dr. Weissman's opinion was supported by her own clinical findings. *See Latifu v. Comm'r of Soc. Sec.*, No. 21-cv-884(KMK), 2022 WL 2532193, at *14 (S.D.N.Y.

May 4, 2022) ("Simply put, supportability is an inquiry confined to the medical source's own records that focuses on how well a medical source supported and explained their opinion.") (citation omitted).  Furthermore, though the ALJ reasoned that Dr. Teli's opinion was "persuasive" because it was supported by Dr. Teli's own clinical findings from his consultative examination of Plaintiff, the ALJ did not explain whether Dr. Teli's opinion was consistent "with the evidence from other medical sources and nonmedical sources" in the record.  20 C.F.R. § 404.1520c(c)(2).

Though remand is warranted where an ALJ fails to adequately evaluate the two most important consistency and supportability factors, *see Acosta Cuevas v. Comm'r of Soc. Sec.,* No. 20-cv-0502(AJN), 2021 WL 363682, at *9 (S.D.N.Y. Jan. 29, 2021) ("Thus, just as under the previous regulations when failure to fully consider the *Burgess* factors derived from 20 C.F.R. §§ 404.15227(c) and 416.929(c) would be grounds for remanding an ALJ's decision, an ALJ's failure to adequately consider and apply the new regulatory factors also require a reviewing court to remand."), "the Court need not remand the case if the ALJ only committed harmless error, *i.e.*, where the 'application of the correct legal principles to the record could lead only to the same conclusion.'" *Jackson v. Kijakazi*, No. 20-cv-7476(JLC), 2022 WL 620046, at *13 (S.D.N.Y. Mar. 3, 2022).

The Court finds that remand is not warranted because had the ALJ properly analyzed the supportability and consistency factors as required by the regulations, she would have reached the same conclusion as to the persuasiveness of the two medical opinions. First, although the ALJ did not weigh the supportability factor in evaluating the persuasiveness of Dr. Weissman's opinion, Dr. Weissman's treatment records indicate that Plaintiff's lumbar spine impairment and carpal tunnel syndrome did not hinder Plaintiff's physical function to the extent suggested by Dr. Weissman. Dr. Weissman opined in her August 12, 2019 medical source statement that Plaintiff could rarely lift and carry less than 10 pounds, could never use her hands to grasp, turn, or twist objects, and could only use her fingers for fine manipulations for 10 percent of an eight-hour workday. (Tr. at 336–37.) Despite this, according to Dr. Weissman's September 6, 2018 treatment notes, Plaintiff was caring for a baby and requested a tetanus shot from Dr. Weissman's physician assistant, Ms. Neema Lama. (*Id.* at 438, 450.) Furthermore, though Dr. Weissman opined in August 2019 that Plaintiff must use a cane or other hand-held assistive device to stand/walk due to her imbalance, pain, weakness, and dizziness, (*id.* at 336), Dr. Weissman's treatment notes make no mention of Plaintiff ever being prescribed a cane or other assistive device or her need for one.

Similarly, though the ALJ did not weigh the consistency factor in evaluating the persuasiveness of Dr. Teli's opinion, which included mild restrictions for bending and prolonged standing and walking, and no limitations specific to Plaintiff's carpal tunnel syndrome, Dr. Mehri Songhorian, a neurologist, who examined Plaintiff on October 23 and November 16, 2017, noted normal range of motion in the extremities, (*id.* at 389, 395), and upon conducting a motor functions examination of Plaintiff on February 1, 2018, noted: "Motor function of lower extremities, hip flexion, hip extension . . . foot extension . . . within normal limits.  Motor function of upper extremities, deltoid, biceps and triceps is within normal limits."  (*Id.* at 419.)  Accordingly, because "the 'application of the correct legal principles to the record could lead only to the same conclusion,'" *Jackson*, 2022 WL 620046, at *13, remand is not warranted.

## II.  The ALJ's Assessment of Plaintiff's Carpal Tunnel Syndrome

Plaintiff also asserts that the ALJ "erred as a matter of law" by failing to include, or provide an explanation as to why she did not include, any manipulative limitations in the RFC for Plaintiff's carpal tunnel syndrome, a condition the ALJ determined to be severe.  (Pl.'s Mem. at 18–20 ("Although the ALJ finds that carpal tunnel is a severe condition, and although the medical records demonstrate the Plaintiff experiences bilateral hand numbness and uses wrist supports, the RFC completely fails to

20

provide for any manipulative limitations whatsoever.  Moreover, if
the ALJ did not believe any manipulative restrictions were
necessary in the RFC, there is no explanation anywhere in the
decision as to why the ALJ reached such a conclusion.").)
Relatedly, Plaintiff argues that the ALJ likewise erred by not
including any manipulative limitations in the hypothetical
presented to the vocational expert.  (*Id.* at 20.)

Courts in this Circuit have held that remand is warranted
where the ALJ fails to account for functional limitations caused
by the plaintiff's severe impairment in the RFC.  *See, e.g.*, *Amanda
F. v. Saul*, No. 19-cv-01026(MJR), 2021 WL 236015, at *6 (W.D.N.Y.
Jan. 25, 2021) ("This case must also be remanded because the ALJ
failed to incorporate any limitations from Plaintiff's severe
impairment of bilateral carpal tunnel syndrome into the RFC.  At
step two, the ALJ determined that Plaintiff's bilateral carpal
tunnel syndrome was a severe impairment. . . . However, the ALJ's
RFC finding contains no limitations relating to Plaintiff's carpal
tunnel syndrome.  Furthermore, the ALJ included no explanation in
the RFC assessment indicating why he omitted any functional
limitations relating to Plaintiff's carpal tunnel syndrome.  This
was error."); *Wharton v. Berryhill*, No. 17-cv-1247(LTS), 2018 WL
5619961, at *17 (S.D.N.Y. Aug. 14, 2018) (remanding for further
proceedings, where "the ALJ found plaintiff's spine and knee
conditions to be severe" but "failed to include (or discuss)

postural limitations related to these conditions when formulating plaintiff's RFC.").

Here, the ALJ provided an explanation and evidentiary support for why she determined that manipulative restrictions were not required in Plaintiff's RFC.  Specifically, the ALJ found that the lifting restrictions for light work, set forth in 20 C.F.R. § 404.1567(b), would accommodate Plaintiff's symptoms caused by the carpal tunnel syndrome, and that "there [were] no manipulative limitations secondary to impairment."  (Tr. at 18.)  The ALJ concluded, relying on Dr. Teli's examination findings of intact hand and finger dexterity, 5/5 grip strength in both hands, 5/5 strength in the upper extremities, and normal range of motion in the wrists and the upper extremities, (*id.* at 325–26), as well as "mild pathology" findings from diagnostic studies, (*id.* at 18, 499), that the severity of Plaintiff's symptoms did not require manipulative restrictions in the RFC.  In the same vein, because the ALJ determined that manipulative restrictions were not required, based on substantial evidence in the record, the Court declines to find that the ALJ committed a legal error by failing to include manipulative limitations in the hypothetical to the vocational expert.

### III. The ALJ's Assessment of Plaintiff's Alleged Need for a Cane

The Court next addresses Plaintiff's argument that the ALJ "erred as a matter of law" by failing to account for Plaintiff's need for a cane/assistive device in the RFC or the hypothetical to the vocational expert. (Pl.'s Mem. at 23—24.) Plaintiff asserts that she began using a cane in February of 2018, when she first reported experiencing a "feeling of imbalance" during her visit with Dr. Songhorian. (Tr. at 419; *see* Pl.'s Mem. at 16 ("[I]t appears that . . . Plaintiff was using her cane for a prolonged period of time. On August 12, 2019, approximately a year and a half after she first reported her imbalance, a Medical Source Statement completed by Dr. Weissman represented that [Plaintiff] was using a cane for balance.").)

There is no evidence in the record, however, supporting Plaintiff's assertion that she used a cane between February of 2018 to August 12, 2019. Dr. Songhorian's treatment notes from February 1, 2018, when Plaintiff reported experiencing a "feeling of imbalance," neither indicate that Dr. Songhorian prescribed a cane to Plaintiff nor that she advised Plaintiff that she needed to use a cane or other assistive device. (Tr. at 419.) Dr. Songhorian also made no findings as to Plaintiff's reported imbalance. (*Id.*) Furthermore, a physical examination of Plaintiff by Dr. Songhorian that same day revealed normal range of motion in

23

the lower extremities, including hip flexion, hip extension, and foot flexion, and no ataxic gait. (*Id.*) During her June 22, 2018 follow up visit with Dr. Weissman, Plaintiff reported that "her sciatica pain [was] terrible," but Dr. Weissman's treatment notes did not make any mention of Plaintiff's imbalance, use of a cane or other assistive device, or a prescription or recommendation for one. (*See generally id.* at 439-440.) Likewise, Dr. Weissman's October 19, 2018 treatment notes stated that Plaintiff's right-sided sciatica was "getting worse" but made no mention of Plaintiff's imbalance, use of a cane or other assistive device, or a prescription or recommendation for one. (*See generally id.* at 455.)

In addition, as previously discussed, Plaintiff did not mention her imbalance, or her use of or need for a cane or other assistive device, during the administrative hearing on September 17, 2019. (*See generally id.* at 33-46.) Plaintiff testified at the hearing that her back pain affected her ability to sit, stand, and walk. (*Id.* at 39.) Specifically, Plaintiff testified that she could only sit for 20 to 25 minutes and stand for about 10 minutes at any given time before experiencing discomfort or pain. (*Id.* at 39–40.) Plaintiff also expressed that she had to take breaks walking two blocks to her doctor's office, but attributed the breaks to her "asthma . . . acting up." (*Id.* at 40.) But

Plaintiff made no mention of a cane or other assistive device during the hearing.

Accordingly, the Court finds that the ALJ did not err by not accounting for Plaintiff's alleged use of or need for a cane in her RFC determination or hypothetical to the vocational expert because substantial evidence in the record supports her conclusion that Plaintiff did not use a cane and that a cane or other assistive device was not medically necessary.

IV. **The ALJ's Assessment of Plaintiff's Obesity**

Plaintiff also contends that the ALJ failed to properly account for her obesity in the RFC and the hypothetical posed to the vocational expert. Plaintiff argues that the ALJ, other than stating conclusorily that her obesity was factored into the RFC, did not explain *how* it was considered, relied on "inaccurate" findings of Dr. Teli, the consultative examiner, erroneously determined that Plaintiff did not use a cane,[4] and failed to apply Social Security Ruling 19-2P ("SSR 19-2p") in evaluating the effect of Plaintiff's obesity, singly and in combination with the other impairments. (Pl.'s Mem. at 22-23 (citing to *Campell v. Barnhart*, 178 F. Supp. 2d 123, 139 (D. Conn. 2001)).)

---

[4] Because the Court has already determined that the ALJ did not err in relying on the medical opinion and findings of Dr. Teli, in Part I, and that there was substantial evidence in the record supporting the ALJ's determination that Plaintiff did not use a cane or other assistive device and one was not medically needed, in Part III, the Court does not revisit the same arguments here.

SSR 19-2p, which sets forth guidance for evaluating cases involving obese claimants, requires an ALJ to consider the claimant's obesity in combination with her other medically determinable impairments. SSR 19-2p, 2019 WL 2374244, at *4 (May 20, 2019). Specifically, when evaluating whether a claimant's obesity impacts her ability to perform exertional or nonexertional functions, the ALJ must consider both the documented impact of the obesity itself as well as the combined effects of the obesity with the other impairments, and "explain how [she] reached [her] conclusion on whether obesity causes any limitations." *Id.*

"Courts have consistently held . . . that 'there is no obligation on an ALJ to single out a claimant's obesity for discussion in all cases,' and that 'an ALJ's failure to address [it] explicitly . . . does not warrant remand.'" *Sanchez v. Saul*, No. 18-cv-12102(PGG), 2020 WL 2951884, at *30 (S.D.N.Y. Jan. 13, 2020) (quoting *Watson v. Astrue*, No. 08-cv-1523(DAB), 2010 WL 1645060, at *4 (S.D.N.Y. Apr. 22, 2010)). *See Wilson v. Colvin*, No. 14-cv-5666(DF), 2015 WL 5786451, at *30 (S.D.N.Y. Sept. 29, 2015) ("This does not mean, however, than an ALJ must always explicitly discuss a claimant's obesity in his or her RFC determination[.]"). Rather, "[a]n ALJ's determination can reflect an appropriate consideration of obesity if it adopts the limitations suggested by physicians who have directly considered the effects of obesity in their opinions." *Id.* at *30 (citing

*Cruz v. Barnhart*, No. 04-cv-9011(GWG), 2006 WL 1228581, at *9
(S.D.N.Y. May 8, 2006)).  "Moreover, the evaluations of treating
physicians on which an ALJ relies need not have explicitly
addressed the claimant's obesity, 'provided the physician's notes
or records demonstrate that the condition was recognized.'"
*Sanchez*, 2020 WL 2951884, at *30 (quoting *Wilson*, 2015 WL 5786451,
at *30).

Here, the ALJ found at step two that Plaintiff's obesity
constituted a severe impairment, (Tr. at 11), and explicitly stated
that she considered Plaintiff's "obesity in combination with her
other impairments . . . in the formulation of the [RFC]."  (*Id.* at
15.)  Additionally, in weighing the opinion evidence in the record
and determining that Plaintiff was capable of performing a limited
range of light work with occasional postural activities, the ALJ
noted that the findings of Dr. Teli on his examination of
Plaintiff, along with Plaintiff's ability to ambulate without an
assistive device, supported such determination.  (*Id.* at 15.)
Further, Dr. Teli, on whose medical opinion and findings the ALJ
relied on in formulating the RFC, indicated that Plaintiff's
obesity was factored into his assessment.  (*Id.* at 325 ("Claimant
appears to be in no acute distress.  Gait normal.  No attempt for
walking on heels and toes.  No squatting due to knee pain.  Claimant
is extremely obese.  Stance is normal.  Uses no assistive device.
Needs no help changing for exam.  Needs no help getting on and off

27

exam table. Able to rise from chair without difficulty.").) *See Drake v. Astrue*, 443 F. App'x 653, 657 (2d Cir. 2011) ("[W]e agree with the District Court that the ALJ implicitly factored [Plaintiff's] obesity into his RFC determination by relying on medical reports that repeatedly noted [Plaintiff's] obesity and provided an overall assessment of her work-related limitations."); *Sanchez*, 2020 WL 2951884, at *30 (holding, in a case where the ALJ's decision does not mention Plaintiff's obesity, that "there is no reason for the Court to conclude that the ALJ specifically erred by failing to give any consideration to Plaintiff's obesity in making his RFC determination" because "the ALJ cited and relied on at least some . . . physicians' evaluations, which implicitly or explicitly recognized Plaintiff's obesity").

Accordingly, remand is not warranted based on the ALJ's alleged failure to properly consider Plaintiff's obesity in the RFC because it is apparent that the ALJ considered the impact of Plaintiff's obesity, both on its own and in combination with Plaintiff's other impairments, in formulating the RFC.

**V.   The ALJ's Assessment of Plaintiff's Alleged Inability to Stoop**

Additionally, Plaintiff asserts that the ALJ improperly discounted the opinion of Dr. Weissman that Plaintiff could never stoop. (Pl.'s Mem. at 25; Tr. at 336.) According to Plaintiff, "[[h]ad the ALJ properly analyzed [Dr. Weissman]'s opinion and

28

found her opinion persuasive, the ALJ would have been legally required to find . . . Plaintiff disabled. . . . because Dr. Weissman found that . . . Plaintiff was unable to stoop." (Tr. at 25.)  First, the Court has already found, in Part I, that the ALJ's failure to consider the supportability factor in evaluating Dr. Weissman's opinion was harmless error and thus need not revisit the same argument here.  In addition, the Court finds that there is substantial evidence in the record supporting the ALJ's determination that Dr. Weissman's opinion that Plaintiff could never stoop/bend was unpersuasive.  Such opinion is inconsistent with the clinical findings of Dr. Teli, specifically, that Plaintiff's cervical spine "show[ed] full flexion," Plaintiff had "[n]o scoliosis, kyphosis, or abnormality in the thoracic spine," and that Plaintiff had 85 degrees of flexion in the lumbar spine. (*Id.* at 325.)  Furthermore, Dr. Weissman's treatment notes do not reflect any finding by Dr. Weissman that Plaintiff could never stoop or bend due to his lumbar spine impairment.  Accordingly, remand is not warranted based on the ALJ's failure to properly consider Plaintiff's alleged inability to stoop.

## VI.   The ALJ Did Not Err by Failing to Consider a Closed Period of Disability

Finally, Plaintiff contends that the ALJ erred in determining that Plaintiff's Bell's palsy was a non-severe impairment.  Relatedly, Plaintiff argues that the ALJ erred failing

to consider, as an alternative to finding Plaintiff disabled, whether Plaintiff "was eligible for a 'closed period' of disability" during the 1-year period between September 2017 when Plaintiff was diagnosed with Bell's palsy, (*id.* at 485—86), and October 19, 2018 when Dr. Weissman noted "much improvement" with Plaintiff's Bell's palsy. (*Id.* at 455; Pl's Mem. at 25—30.)

"A closed period of disability refers to when a claimant is found to be disabled for a finite period of time which started and stopped prior to the date of the administrative decision granting disability status." *Pettaway v. Colvin*, No. 12-cv-2914(NGG), 2014 WL 2526617, at *13 (E.D.N.Y. June 4, 2014). "When deciding a disability claim, '[i]f a claimant is disabled at any point in time, the ALJ should consider not only whether Plaintiff was disabled at the time of the hearing, but also whether Plaintiff was entitled to disability benefits for any closed, continuous period . . . following the date of [her] claim.'" *Love v. Kijakazi*, No. 20-cv-1250(EK), 2021 WL 5866490, at *5 (E.D.N.Y. Dec. 10, 2021).

First, Plaintiff asserts that the ALJ's determination that Plaintiff's Bell's palsy was non-severe based on the results of Plaintiff's October 11, 2017 brain MRI, which was normal other than left maxillary sinus disease, (Tr. at 504), was "improper." (Pl.'s Mem. at 27.) Plaintiff relies on a December 12, 2017 psychiatric consultative examination report, which indicated that

Plaintiff had a "[m]ild articulation problem" and "half her face looked numb," (Tr. at 62), to argue that "the MRI results did not tell the whole story." (Pl.'s Mem. at 27–28.) Plaintiff asserts that she suffered from decreased vision as a result of the Bell's palsy, and speculates, without citing to any evidence in the record, that the symptoms caused by the Bell's palsy would have affected the "available jobs in the national economy" that Plaintiff could perform, and caused "problems in focusing, or in concentration, persistence, and pace, or absenteeism," as well as "problems interacting with the public or with supervisors and employees." (*Id.* ("It is hard to imagine a scenario where Ms. Krupp could go out and work with numbness in her face. . . . And, most certainly, the fact that Ms. Krupp experienced a sudden change in her life that caused temporary blindness followed by a year of a numb face with drooping facial features could cause a psychological effect. This effect could reasonably cause the Plaintiff mental difficulties, such as difficulties concentrating, being on-task, and could result in absenteeism. Not to mention being self-conscious as a result of these symptoms could result in the Plaintiff not wanting to have contact with the public, supervisors, or employees, which could impact the number of available jobs in the national economy.").)

Critically, Plaintiff does not cite to the administrative record in support of her argument that the mild articulation problem caused by her Bell's palsy was of such severity as to impact the number of jobs in the national economy that Plaintiff could perform, or that the Bell's palsy affected her ability to interact with others, concentrate, be on-task, and caused absenteeism. (*Id.* at 28.)  Accordingly, the Court declines to rely on Plaintiff's speculations in determining whether the ALJ erred in finding that Plaintiff's Bell's palsy was not a severe impairment.  Furthermore, there is substantial evidence in the record supporting the ALJ's determination that Plaintiff's Bell's palsy had no more than a minimal effect on Plaintiff's ability to perform basic work activities.

First, Plaintiff testified at the hearing before the ALJ that she "lost vision in [her] right eye" due to the Bell's palsy; however, an eye exam conducted on October 23, 2017, about a month after Plaintiff was diagnosed with Bell's palsy, revealed that Plaintiff had 20/25 vision in her right eye, 20/20 vision in her left eye, and 20/20 vision in both eyes without glasses.  (Tr. at 41-42, 324.)  Moreover, Plaintiff did not report any issues with her vision to Dr. Songhorian during her visits on October 12, November 16, and November 27 in 2017, and on February 1, 2018, (*see generally id.* at 389, 392, 395, 419), and Dr. Weissman's treatment notes postdating Plaintiff's Bell's palsy diagnosis in

September 2017 likewise did not mention any issues related to Plaintiff's vision. (*See generally id.* at 386, 455 (treatment report dated October 19, 2018); 393 (treatment report dated October 10, 2017); 414–16 (treatment report dated May 14, 2018); 417–18 (treatment report dated February 1, 2018); 432–34 (treatment report dated October 25, 2018); 436–38 (treatment report dated September 6, 2018); 439–41 (treatment report dated June 22, 2018); 466 (treatment report dated October 3, 2017).)

In addition, though Plaintiff reported, on October 12, 2017, experiencing hyperacusis, decreased taste, and pain in the back of her ear due to the Bell's palsy, (*id.* at 395), by November 16, 2017, her taste had returned, hyperacusis was better, and Plaintiff "had no numbness or tingling sensation in her face or tongue." (*Id.* at 392.) And though Dr. Georgiou, the consultative psychologist who examined Plaintiff on December 1, 2017, noted her "[m]ild articulation problem" and apparent facial numbness on one side of her face, (*id.* at 330), Dr. Teli noted, upon examining Plaintiff on October 23, 2017 that her "[f]acies [were] normal," notwithstanding his observation that Plaintiff had "right facial weakness." (*Id.* at 325.) Furthermore, Dr. Songhorian noted that Plaintiff's speech was fluent and comprehension intact on October 12, November 16, and November 27, 2017, and February 1, 2018. (*Id.* at 392, 389, 419.) Finally, Plaintiff made no mention of the effect the Bell's palsy had on her ability to articulate at the

33

administrative hearing before the ALJ.   (Tr. at 35, 41-42.) Accordingly, the Court finds that there is substantial evidence in the record to support the ALJ's determination that the mild articulation problem suffered by Plaintiff as a result of the Bell's palsy did not severely limit Plaintiff's ability to engage in basic work activities.

The Court likewise rejects Plaintiff's argument, alleged for the first time in her reply, that even if Plaintiff's Bell's palsy were not a severe impairment, the ALJ erred by "not properly accounting for [it] in the RFC determination, or by failing to explain why no such limitations were included."   (ECF No. 21, Plaintiff's Reply Memorandum in Support of Plaintiff's Motion for Judgment on the Pleadings, at 6.)   The ALJ recounted the history of Plaintiff's Bell's palsy in her RFC analysis, including the condition's onset in September 2017, Plaintiff's visits to the neurologist, Dr. Songhorian, between October 2017 and February 2018, as well Dr. Weissman's note from Plaintiff's October 19, 2018 visit that there "had been much improvement" with the Bell's palsy.   Furthermore, there is substantial evidence in the record, as discussed above, supporting the ALJ's determination that no additional limitations specific to Plaintiff's Bell's palsy were required in the RFC.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for judgment on the pleadings is respectfully **DENIED** and the Commissioner's cross-motion for judgement on the pleadings is **GRANTED.** The Clerk of Court is directed to enter judgment in favor of the Commissioner, and to close the case.

**SO ORDERED.**

DATED:     October 4, 2022
           Brooklyn, New York

                                    _____
                                              /s/
                                    **HON. KIYO A. MATSUMOTO**
                                    United States District Judge
                                    Eastern District of New York